UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
TANYA PADGET,                          :   15 Civ. 3358 (GBD) (JCF)
                                       :
              Plaintiff,               :        REPORT AND
                                       :      RECOMMENDATION
     - against -                       :   ┌─────────────────────────────┐
                                       :   │ USDS SDNY                   │
CAROLYN W. COLVIN, Commissioner of :   │ DOCUMENT                    │
Social Security,                       :   │ ELECTRONICALLY FILED        │
                                       :   │ DOC #: _____ │
              Defendant.               :   │ DATE FILED: 2/8/16          │
- - - - - - - - - - - - - - - - - -:   └─────────────────────────────┘
TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:

     The plaintiff, Tanya Padgett,[1] brings this action pursuant to

section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. §

405(g), seeking review of a determination of the Commissioner of

Social Security (the "Commissioner") finding that she is not

entitled to Supplemental Security Income ("SSI") benefits.   The

Commissioner has filed a motion for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,

which the plaintiff did not oppose.[2]  For the reasons that follow,

I recommend denying the Commissioner's motion, vacating the

Commissioner's decision denying benefits, and remanding the case

for further administrative proceedings.

---

[1] Although the plaintiff's surname is spelled "Padget" in the
caption of her complaint, it is spelled "Padgett" throughout the
administrative record, and the plaintiff signed her name using the
latter spelling.  (See Order dated April 30, 2015).

[2] The docket reflects that Ms. Padgett's attorney filed the
complaint on Ms. Padgett's behalf and filed three requests for an
extension of time to file her response to the present motion.
After the third request was denied, the attorney appears to have
abandoned the case.

Background

    A.  Personal and Vocational History

    Ms. Padgett was born on September 8, 1976, and filed her application for SSI benefits on March 31, 2013, when she was 36 years old.[3] (R. at 125, 172).[4] Before she stopped in May 2009, Ms. Padgett had worked periodically during the previous six years as a groundskeeper with the New York City Department of Parks and Recreation. (R. at 187-88, 194-95, 206). As a groundskeeper, she was responsible for garbage removal at various city parks. (R. at 196). She stopped working due to depression, anxiety, and insomnia. (R. at 103, 194). Ms. Padgett stopped going to school in the eleventh grade and indicated in her application that she has no vocational or specialized job training. (R. at 110, 195).

    B.  Medical History

    Most of the medical evidence contained in the administrative record consists of medical records from three facilities -- St.

---

[3] Even though Ms. Padgett alleged a disability onset date in May 2009 (R. at 76), SSI benefits "can only be granted prospectively"; therefore "the only issue [to be decided] is whether [Ms. Padgett] was disabled under the Act as of . . . the date of [her] application." Dehnert v. Astrue, No. 07 CV 897, 2009 WL 2762168, at *4 (N.D.N.Y Aug. 24, 2009) (collecting cases); 20 C.F.R. § 416.335. However, the ALJ is required to develop a "complete medical history," which includes at least the twelve months preceding the filing of an application. Price ex rel. A.N. v. Astrue, 42 F. Supp. 3d 423, 433 (E.D.N.Y. 2014) (quoting 42 U.S.C. § 423(d)(5)(B)). That medical history may provide "some evidence, at least circumstantial, that the mental illness had an element of continuity past the date of application." Dehnert, 2009 WL 2792168, at *5.

[4] Citations to "R." refer to the Administrative Record that the Commissioner filed with the Court as part of her answer to the complaint.

Francis Hospital ("St. Francis") (R. at 224-40), Lincoln Medical and Mental Health Center ("Lincoln") (R. at 241-74), and Morris Heights Health Center ("Morris Heights") (R. at 275-462, 470-519) -- and a consultative psychiatric evaluation prepared by Dr. David Mahony.[5]   (R. at 463-67).   During a hearing before an Administrative Law Judge ("ALJ"), Ms. Padgett testified that she has "been going [to Morris Heights] for awhile" and that she sees two doctors there, "Oche Akoomba" and "Rick Chaperone."[6]   (R. at 101, 110-111).[7]  Ms. Padgett indicated the Mr. Chaperon has been her "therapist" since 2009 and stated that she "see[s] [him] every week, every Monday" for an hour.   (R. at 111-12).   As for Dr. Akwuba, Ms. Padgett said, "[h]e's my doctor I see right now," but indicated that he had only recently started writing prescriptions for her medications.   (R. at 110-12).   Regarding St. Francis, Ms. Padgett said that she "was in [there] for a month."  (R. at 108). She further stated that "she was going [to Lincoln] to get [her] medical and [she] and the site doctor[] really have not been getting along, so [she] wasn't getting [her] medication;" also she

---

[5]  In assessing a claim for SSI, the Social Security Administration may require the claimant to undergo a "consultative evaluation" to "try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision" on the claim.  20 C.F.R. § 416.919a(b).

[6]  Based on the medical records from Morris Heights, Ms. Padgett was most likely referring to Dr. Uche Akwuba (R. at 499) and Mr. Volvic Chaperon (R. at 376), a licensed clinical social worker.

[7]  Ms. Padgett stated that there is a third doctor she sees at Morris Heights and later suggested that her "primary doctor" was on maternity leave at the time of the hearing, causing her to see Dr. Akwuba for the time being.  (R. at 100-02, 110).

had been admitted to its psychiatric ward for twelve days, though she could not remember when.  (R. at 108, 111).  While the medical records indicate that Ms. Padgett may have received psychiatric treatment at other facilities (R. at 228 ("patient to go to Women in Need"), 435 ("[patient] is currently in mental health therapy at 'South Bronx mental health'"), there is no documentation of such treatment in the administrative record.

    1. <u>Morris Heights</u>

Although the medical records from Morris Heights span from March 27, 2009, to September 30, 2013 (R. at 280-84, 518-19), they are largely irrelevant to the stated basis for Ms. Padgett's SSI claim, i.e., depression, anxiety, and insomnia (R. at 103-04, 194). Moreover, much of the information that <u>does</u> relate to the plaintiff's psychological condition is insubstantial, consisting of terse notations from doctors, nurses, and other staff.

On November 17, 2009, Ms. Padgett indicated that she was feeling depressed and that she had only been able to sleep two hours per night during the past two months.  (R. at 295-97).  She was prescribed Ambien and referred for a psychiatric consultation. (R. at 296-97).  More than a year later, on December 21, 2010, she presented with "anxiety," complaining of "not being able to sleep and 'pacing' a lot [sic]."  (R. at 336-37).  Ms. Padgett continued to complain of insomnia and anxiety (<u>e.g.</u>, R. at 344, 347), although a notation in her chart states that "[she] refuses to keep mental health appointments."  (R. at 348).

Mr. Chaperon performed a behavioral health screening of Ms.

Padgett on November 18, 2011. (R. at 376-79).   The screening
indicates that Ms. Padgett reported experiencing symptoms of
depression, anxiety, and insomnia "nearly every day" and that these
symptoms made doing work, household chores, and getting along with
other people "[s]omewhat difficult." (R. at 376).  Mr. Chaperon
observed that Ms. Padgett was "referred [] for therapy due to a
history of depression and insomnia," that she "was hospitalized in
2008 at Lincoln" because her mother "believed [she] was suicidal,"
and that "she may need a hire [sic] level of care for her
treatment." (R. 378-79).  Mr. Chaperon reported Ms. Padgett's
Global Assessment of Functioning ("GAF") score as 59.[8]  (R. at
379).

The Morris Heights records contain two subsequent mental
health screenings conducted by Mr. Chaperon on July 23, 2012, and
September 23, 2013.  (R. at 420-24, 504-08).  The July 23
assessment is similar to the November 18 assessment, noting that
"[Ms. Padgett] still has problems with depression and insomnia" and
"wishes she [were] not alive and at times she becomes very

---

[8] The GAF is a psychiatric assessment tool that generates a
numerical representation of a clinician's judgment as to a
patient's overall functioning along a continuum of mental health.
See American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-5").  The GAF
was dropped from DSM-5 "for several reasons, including its
conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  Id.  The GAF Scale provides scores from 1
("[p]ersistent danger of severely hurting self or others") to 100
("[s]uperior functioning in a wide range of activities").  A GAF
score between 51-60 indicates "[m]oderate symptoms . . . [or]
moderate difficulty in social, occupational, or school
functioning."  American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders 34 (4th ed. text revision
2000) ("DSM-IV").

irritable." (R. at 422-23). Her GAF score on July 23 was 50.[9] (R. at 423). The September 23 assessment indicates some improvement in Ms. Padgett's condition, particularly in her responses to many of the screening questions, where Mr. Chaperon noted that Ms. Padgett was compliant with her medication regimen at the time of the screening. (R. at 504). However, Mr. Chaperon later observed that Ms. Padgett, even when taking her medications, "has poor sleeping habits, feelings of depression, anxiety[,] and sporadic panic attacks." (R. at 506-07). He also noted that "[Ms. Padgett] does not get along with her previous psychiatrist at Lincoln Hospital . . . . [She] stopped seeing [the psychiatrist] in July 2013." (R. at 507). Indeed, Ms. Padgett had seen Dr. Akwuba on August 29, 2013, at which time he noted that Ms. Padgett was not taking her medications "due to poor raport [sic] with Psych" and provided her with new prescriptions. (R. at 503). Mr. Chaperon assessed the plaintiff's GAF score as 65.[10] (R. at 508).

　　2. <u>Lincoln</u>

　　The records from Lincoln contain no information regarding Ms. Padgett's twelve-day admission to the psychiatric ward that she referred to in her testimony before the ALJ (R. at 108) and in her conversations with Mr. Chaperon (R. at 378, 423, 507).

---

[9] A GAF score of 41-50 indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning." <u>DSM-IV</u> at 34.

[10] A GAF score of 61-70 indicates "[s]ome mild symptoms . . . [or] some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, [with] some meaningful interpersonal relationships." <u>DSM-IV</u> at 34.

Furthermore, there are no records of the treatment that Ms. Padgett received from the psychiatrist at Lincoln.  What the records do show is that, on at least two occasions, Ms. Padgett presented in the emergency department to have her psychiatric prescriptions filled.  (R. at 261 (12/20/12), 249 (2/6/13)).  During one of those visits she met with a social worker, though the report of that consultation offers little new information regarding her condition.  (R. at 261-64).  There is also some indication that Ms. Padgett completed an intake examination with the psychiatric department on February 26, 2013, at which time a GAF score of 58 was assessed, and that her treatment by that department was terminated after she missed three appointments.  (R. at 248, 274).

### 3.  St. Francis

Ms. Padgett was admitted to St. Francis from October 1, 2012, to October 31, 2012, to participate in an alcohol rehabilitation program.  (R. at 224).  The St. Francis records contain four narrative reports (R. at 225-35), including a psychiatric evaluation (R. at 233-35).  That evaluation states that Ms. Padgett "has panic, anxiety, dysphoria, difficulty sleeping, and a history of insomnia for at least 5 years, depression for at least 3 years with panic for about 3 or 4 years," and diagnoses her with, among other things, "dysthymia and posttraumatic stress disorder."[11]  (R.

---

[11] "The essential feature of persistent depressive disorder (dysthymia) is a depressed mood that occurs for most of the day, for more days than not, for at least 2 years . . . ."  DSM-5 at 169.

at 233-34).  The report assesses her GAF score as 38.[12]  The medical
discharge summary characterizes Ms. Padgett's condition at the time
of discharge as "[s]table" and describes her prognosis as "[g]ood
if she follows through with the aftercare plan."  (R. at 226).

    4.  Dr. Mahony

    Dr. Mahony "examined [Ms. Padgett] for a consultative
examination."  (R. at 466).  His report diagnoses Ms. Padgett with
"[d]ysthymic disorder," "[e]ating disorder, NOS" or not otherwise
specified,[13] and "[a]lcohol dependence, in sustained early
remission."  (R. at 466).  Regarding Ms. Padgett's limitations, Dr.
Mahony observed as follows:

> There is no evidence of limitation in the claimant's
> ability to follow and understand simple directions and
> instructions, perform simple tasks independently,
> maintain attention and concentration, or maintain a
> regular schedule.  She may have mild difficulties
> learning new tasks, performing complex tasks
> independently, and making appropriate decisions.  No
> evidence of limitation relating to other people or
> dealing with stress.  The claimant's difficulties are due
> [to] psychiatric and cognitive problems.
>
> The results of the evaluation are consistent with
> psychiatric and cognitive problems, but these do not seem
> to interfere with the claimant's ability to function on
> a daily basis.  The claimant was unable to clarify how
> her symptoms prevent her from functioning.

(R. at 465-66).  He also stated that Ms. Padgett "reports she can
dress, bathe, and groom herself, cook, clean, shop, and do all

_____

[12] A GAF score of 31-40 indicates "[s]ome impairment in reality
testing or communication . . . [or] major impairment in several
areas, such as work or school, family relations, judgment,
thinking, or mood."  DSM-IV at 34.

[13] Eating disorder not otherwise specified is a designation for
"disorders of eating that do not meet the criteria for any specific
Eating Disorder."  DSM-IV at 594.

household [activities of daily living]. She socializes with friends and spends her time at home." (R. at 465).

C. Procedural History

The plaintiff filed her application for SSI benefits on March 31, 2013, on the basis of depression, anxiety, and insomnia. (R. at 76, 194). In her application she indicated that she became disabled on May 1, 2009. (R. at 76). After her application was denied on June 11, 2013, she requested review by an ALJ; a hearing was held on October 4, 2013, before ALJ Jack Russak. (R. at 90, 93).

Ms. Padgett appeared at the hearing pro se via video teleconference. (R. at 95). Regarding her past employment, she testified that she had not worked "since 2008 or 2002" but later indicated that she stopped working in 2009. (R. at 96, 103). She testified that previously she worked as a groundskeeper for the Parks Department through a workfare program. (R. at 96, 110).[14] This was the only job Ms. Padgett had during the previous fifteen years. (R. at 121, 195). Ms. Padgett stopped going to school in the eleventh grade and indicated in her application that she has no vocational or specialized job training. (R. at 110, 195). The reason she gave for leaving her position is that she "wasn't attending the job" because of her depression. (R. at 103).

Regarding her condition, Ms. Padgett testified that she has

_____

[14] The hearing transcript shows that the ALJ asked Ms. Padgett if she worked for the Parks Department "because you were on due welfare [phonetic]" (R. at 110); other documents in the administrative record suggest that this was most likely a reference to a workfare program (R. at 463).

depression, "high anxiety," and insomnia.   (R. at 104).   She further testified that she takes Wellbutrin, Zoloft, and Seroquel to treat her condition.   (R. at 112).[15] As for her symptoms, Ms. Padgett testified that she "hallucinate[s] a lot," seeing things move across the floor and hearing voices that are not there, and that she cannot stay asleep for more than a few hours at a time. (R. at 113-14).   Ms. Padgett has lived alone for eight or nine years.   (R. at 104).   While she stated that she goes shopping for food and sometimes cleans her apartment, she also stated that she does not clean her dishes, that a friend comes to cook for her, and that her sister does her laundry.   (R. at 114-15).   During the day, Ms. Padgett "stay[s] at home and [] isolate[s] [her]self," leaving her apartment only when she has appointments, to visit her son, or to go to the store.   (R. at 116-17).   Ms. Padgett goes to therapy with Mr. Chaperon "every Monday" for an hour.   (R. at 111).

Vocational expert Christina Portman also testified at the hearing.   (R. at 119-23).   She identified Ms. Padgett's only past

---

[15] The plaintiff also testified that she "take[s] Symbicort twice.   Once in the morning, 100 milligrams, and 300 at night." (R. at 112).   Symbicort is a medicine "containing a corticosteroid" used to treat asthma and chronic obstructive pulmonary disease. See Label: Symbicort - budesonide and formoterol fumerate aerosol, National Institutes of Health, U.S. National Library of Medicine, http://dailymed.nlm.nih.gov/dailymed/index.cfm (search "symbicort" in search field) (last visited Jan. 22, 2016).   The most recent records from Morris Heights, dated September 30, 2013, indicate that Ms. Padgett was prescribed Zoloft and Seroquel, and that her prescription for Wellbutrin was terminated.   (R. at 514).   It seems most likely Ms. Padgett meant Seroquel when she said Symbicort, especially as she later states that she takes 300mg of Seroquel at night.   (R. at 112).

relevant work as groundskeeper ("medium with an SVP of 3").[16]   (R.
at 121).   The ALJ posed a hypothetical question that posited a
claimant with the same work experience, education, and age as the
plaintiff, who can engage in light, low-stress work involving
walking "a high percent of the day," but limited to "simple,
routine tasks," requiring only "occasional decision making[] [and]
changes in the work setting," and "only occasional judgment [] on
the job and only occasional interaction with the public and co-
workers."   (R. at 121).   Ms. Portman found that this hypothetical
individual could perform not only the plaintiff's past work as a
groundskeeper, but also the work of a "reading room attendant"
("medium and SVP of 2"),[17] a "kitchen helper" ("strength is medium"
and "title is simple"), and a "[l]aundry worker" ("medium, SVP of
2").   (R. at 121-22).   When the ALJ asked whether jobs would be
available for the same hypothetical worker if that worker required
"20 percent of off task," i.e. eight hours spent off task per

---

[16] The Dictionary of Occupational Titles, which the vocational
expert cited, provides both a strength rating and a "Specific
Vocational Preparation" ("SVP") score for each occupational title.
See Dictionary of Occupational Titles Appendix C (4th ed. 1991)
("DOT").   The strength rating "reflects the estimated overall
strength requirement of the job."   A "medium" strength rating means
"[e]xerting 20 to 50 pounds of force occasionally, and/or 10 to 25
pounds of force frequently, and/or greater than negligible up to 10
pounds of force constantly to move objects."   Id.   The SVP score
represents "the amount of lapsed time," expressed in months,
"required by a typical worker" to learn the skills and information
necessary for "average performance in a specific job-worker
situation."   Id.

[17] Although the transcript refers to a "reading room
attendant," the vocational expert cited DOT code "222.387-030."
(R. at 121).   That DOT code refers to a "linen room attendant,"
which is the occupational title ALJ Russak refers to in his opinion
(R. at 82).

workweek, Ms. Portman responded "[n]o, there would not be."  (R. at 122).  Ms. Portman's testimony essentially ended there.

On December 2, 2013, ALJ Russak issued a decision finding that the plaintiff was not disabled within the meaning of the Social Security Act during the period beginning March 31, 2013.  (R. at 83).  The Appeals Council denied Ms. Padgett's request for review on March 9, 2015, making the ALJ's determination the final decision of the Commissioner in her case.  (R. at 1).  The present action followed.

Analytical Framework

A. Determination of Disability

A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if she can demonstrate, through medical evidence, that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015).  The disability must be of "such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability

benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4).  First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(I), (b).  Second, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(a)(4)(ii), (c).  Third, if the impairment is listed in what are know as "the Listings," 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled.  20 C.F.R. § 416.920(a)(4)(iii), (d).  Fourth, if the claimant is unable to make the requisite showing under step three, she must prove that she does not have the residual functional capacity ("RFC") to perform her past work.  20 C.F.R. § 416.920(a)(4)(iv), (e).  Fifth, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform.  20 C.F.R. §§ 416.920(a)(4)(v), (g), 416.960(c); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work

experience.   Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

   B. Judicial Review

   Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

   The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence."  Geertgens v. Colvin, No. 13 Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

   Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008).  Second, the court must decide whether the ALJ's decision was supported by substantial evidence.  Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008

WL 4452359, at *8.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi, 2009 WL 50140, at *21 (citing Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), and Williams v. Bowen, 859 F.2d 255, 256 (2d Cir. 1988)).  Substantial evidence in this context is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

<u>Analysis</u>

A.   <u>The ALJ's Decision</u>

ALJ Russak analyzed the plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that she was not disabled on or after the date she filed her application for benefits.  (R. at 78-83).  He first determined that Ms. Padgett had not engaged in substantial gainful activity since the date she filed her application.  (R. at 78).  Next, at step two, he found that Ms. Padgett has severe impairments, specifically posttraumatic stress disorder, depressive disorder, and alcohol abuse in early remission, and that these impairments result in limitations that significantly affect her ability to perform basic work activities. (R. at 78).  At step three, ALJ Russak found that none of the plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the impairments listed in the

Listings.  (R. at 78-79).  More specifically, ALJ Russak found that Ms. Padgett's impairments did not meet the criteria for three listed impairments: (1) affective disorders (listing 12.04); (2) anxiety related disorders (listing 12.06); and (3) substance addiction disorders (listing 12.09).[18]  (R. at 78).  That is, she did not have at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  He first concluded that, based on Dr. Mahony's report and Ms. Padgett's testimony, the plaintiff did not experience any of the "paragraph B" restrictions.  (R. at 78-79).  Rather, ALJ Russak found Ms. Padgett's limitations to be, at worst, "moderate."  (R. at 78-79).  Next, he determined that none of the "paragraph C" criteria were satisfied, as he found "no evidence of decompensation, [a] likelihood of future decompensation, or [an] inability to live outside a highly supportive living arrangement."  (R. at 79).

Proceeding to step four, ALJ Russak concluded that the

─────────

[18]  Although ALJ Russak's analysis focused on the affective disorders listing, that analysis excluded both anxiety related disorders and substance addiction disorders as potential impairments in the plaintiff's case.  In ruling out an affective disorder, ALJ Russak also necessarily excluded an anxiety disorder because the required "paragraph B" or "paragraph C" criteria are the same for both conditions.  See 20 C.F.R. Part 404, Subpt. P, App. 1, Listings 12.04, 12.06.  Furthermore, because establishing a substance addiction disorder requires satisfying the criteria of one of nine other listed conditions, ALJ Russak's analysis also eliminates the possibility that Ms. Padgett suffers from a sufficiently severe substance addiction disorder.  See 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 12.09.

plaintiff "has the [RFC] to perform a full range of work at all
exertional levels" but noted several nonexertional limitations.
(R. at 79).  While ALJ Russak found that the medical evidence
established that the plaintiff had "medically determinable
impairments [that] could reasonably be expected to cause" the
symptoms of which she complained, he also found that her statements
"concerning the intensity, persistence and limiting effects of
th[ose] symptoms" were "not entirely credible." (R. at 80).  In
this regard, ALJ Russak observed that, although the plaintiff's
medical records show that she periodically complained of
psychiatric problems, those same records "consistently indicated
that [the plaintiff] has denied anxiety, is alert and cooperative,
and has had a normal mood and affect, normal attention span and
attention, and intact memory." (R. at 80).  He also cited
notations in the plaintiff's chart that showed that (1) she had
failed to keep appointments with her doctors and refused to accept
substance abuse treatment (R. at 248, 348); (2) she "does well with
her psychiatric medications but does not always take t[hem]
consistently" (R. at 261); and (3) although her GAF was assessed as
low as 38 and 50, as of July 26, 2012, "her highest GAF from the
past year had been 70 and her expected GAF at discharge was 85"[19]
(R. at 423-24).  (R. at 80-81).  Finally, ALJ Russak highlighted

---

[19] The administrative record contains no evidence that anyone
treating Ms. Padgett ever assessed her GAF at 85.  Furthermore,
although several entries in the medical records indicate that "the
highest GAF from the past year" was 70 (R. at 379, 423, 508), no
entry actually assesses the plaintiff's current GAF score at that
level.

Dr. Mahony's finding that, during his examination of the plaintiff, she "appeared to exaggerate her cognitive deficits," and also the plaintiff's testimony that she could "travel alone by train and occasionally shop, do laundry, and clean her apartment."[20]  (R. at 81).  Having determined the plaintiff's RFC, the ALJ concluded his step four analysis by finding that the plaintiff was unable to perform any past relevant work.  (R. at 81).

At the final step in his analysis, ALJ Russak found that the plaintiff was not disabled because "jobs exist in significant numbers in the national economy" that the plaintiff -- given her age, education, work experience, and RFC -- can perform.  (R. at 82).  He based this conclusion on the fact that the vocational expert testified that a hypothetical individual with the plaintiff's skills and RFC could perform the work of a linen room attendant, a kitchen helper, and a laundry worker, and that such jobs existed in the economy.  (R. at 82).

B.  <u>Legal Error</u>

1.  <u>Failure to Develop the Record</u>

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."  <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996).  This obligation requires the ALJ to make "'every reasonable effort' to help an applicant get medical reports from her medical sources" and other evidence to resolve any

---

[20] Ms. Padgett testified that she does <u>not</u> do her own laundry, but rather relies on her sister to do it for her.  (R. at 115).

"inconsistencies, gaps or ambiguities in the record." Villarreal
v. Colvin, No. 13 Civ. 6253, 2015 WL 6759503, at *17 (S.D.N.Y. Nov.
5, 2015) (quoting 20 C.F.R. §§ 404.1512(d), 416.912(d)).  In cases
involving pro se claimants, the ALJ's duty to assist the claimant
in obtaining assessments from her treating sources and to develop
the record is heightened.  Jones v. Apfel, 66 F. Supp. 2d 518, 523-
24 (S.D.N.Y. 1999).

The record in the present case is woefully incomplete.  As the
Commissioner points out, ALJ Russak based his RFC determination
almost entirely on Dr. Mahony's evaluation, as there are "no
opinions from a treating physician in the record."  (Memorandum of
Law in Support of the Commissioner's Motion for Judgment on the
Pleadings ("Def. Memo.") at 12).  However, there are numerous
indications in the record and in the plaintiff's testimony that
point to significant gaps in her medical history.

First, while the plaintiff testified that she sees Mr.
Chaperon for an hour every week and that he has been treating her
"for a very long time" (R. at 111-12), the administrative record
includes only three entries from Mr. Chaperon among the hundreds of
pages of documents from Morris Heights.  Ms. Padgett also testified
that she was under the care of Dr. Akwuba, but the record contains
almost no relevant information about her condition from Dr. Akwuba.
Second, the plaintiff's testimony and the records from her visits
to Morris Heights indicate that she was being treated by a
psychiatrist at Lincoln during a particularly relevant period.  (R.
at 111, 503, 507).  However, among the thirty-four pages of

19

documents from Lincoln, there is hardly any substantive information about the plaintiff's condition or treatment.  (R. at 241-74). Finally, the plaintiff's medical records suggest that she may have received additional treatment for which no records have been provided.  (R. at 228, 426, 435).

In the face of these substantial gaps in the plaintiff's medical history, ALJ Russak made almost no effort to develop a more complete record.  At the hearing, he failed to elicit further information from the plaintiff regarding treatment she had received or doctors she had seen at any facility other than Morris Heights. (E.g. R. at 108, 111); see Serrano v. Barnhart, No. 02 Civ. 6372, 2005 WL 3018256, at *2 (S.D.N.Y. Nov. 10, 2005) ("An ALJ is [] obligated to explore the facts of a pro se claimant's case by . . . asking questions of the applicant to assist in developing the case.").  After the hearing, ALJ Russak's only attempt to obtain additional information regarding Ms. Padgett's medical history was to send a subpoena to Morris Heights requesting "all medical records" without referring to either Mr. Chaperon or Dr. Akwuba. (R. at 87).  See Molt v. Commissioner of Social Security, No. 1:05-CV-0418, 2009 WL 5214920, at *6 (N.D.N.Y. Dec. 28, 2009) (remanding where record contained "no indication . . . that the ALJ requested [the plaintiff's] treating sources" provide functional assessments or other opinions); Pettey v. Astrue, 582 F. Supp. 2d 434, 437 (W.D.N.Y. 2008) (remanding where record lacked "RFC reports . . . an RFC questionnaire [and] [] evidence specific to plaintiff's alleged functional limitations" from plaintiff's treating source).

Although an ALJ "is not required to attempt to obtain additional evidence to fill any gap in the medical evidence," Francisco v. Commissioner of Social Security, No. 13 Civ. 1486, 2015 WL 5316353, at *11 (S.D.N.Y. Sept. 12, 2015), in this case the gaps are particularly problematic. ALJ Russak cited inconsistencies in the plaintiff's medical records as a basis for finding her statements regarding the intensity, persistence, and limiting effects of her symptoms not credible. (R. at 80-81). As he correctly explained, such a finding must be based on the "objective medical evidence" and "a consideration of the entire case record." (R. at 80); Santiago v. Colvin, No. 12 Civ. 7052, 2014 WL 718424, at *18 (S.D.N.Y. Feb. 25, 2014) (stating that to assess credibility "the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony"). The failure in this case to develop a more complete record of the plaintiff's condition made ALJ Russak's evaluation of Ms. Padgett's credibility unfair, as it was based on an obviously incomplete picture. Cf. Kitt v. Commissioner of Social Security, No. 14 CV 5632, 2015 WL 4199281, at *2 (E.D.N.Y. July 13, 2015) ("From the duty to develop the record follow the duty to listen to subjective complaints . . . and, above all, the duty to be fair."). I recommend that the plaintiff's case be remanded to inquire further into her treatment history and to solicit from her treatment providers information concerning her condition, symptoms, and limitations.

2.  <u>Weight Accorded to Evidence in the Record</u>

The regulations governing disability determinations set out in great detail how evidence in the administrative record should be evaluated and the weight it should be accorded.  The regulations distinguish between "acceptable medical sources," who can provide evidence to establish whether a claimant has a medically determinable impairment, and "other sources," who can provide evidence to show the severity of a claimant's impairment and how it affects her ability to work.  20 C.F.R. §§ 416.913(a) and (d). When evaluating opinion evidence from an acceptable medical source, an ALJ must consider several factors: (1) whether the source has examined the claimant; (2) the treatment relationship between the source and the claimant, including its length, the frequency of examination, and the nature and extent of the treatment; (3) the support the source provides for her findings and opinions; (4) how consistent the source's opinion is with the record as a whole; (5) whether the source has specialized knowledge; and (6) other factors "which tend to support or contradict" the source.  20 C.F.R. § 416.927(c).  However, the regulations "do not explicitly address how to consider relevant opinions and other evidence from 'other sources.'" Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).  Nevertheless, the factors for evaluating opinion evidence from acceptable medical sources "represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources,'" including licensed social workers.  <u>Id.</u> at *4.  In fact, in some

cases the proper application of these factors to the evidence in the record can cause the opinion of an "other source" to be afforded more weight than the opinion of an acceptable medical source. Id. at *5; Hernandez v. Astrue, 814 F. Supp. 2d 168, 183 (E.D.N.Y. 2011).

Absent from ALJ Russak's opinion is any explanation of the weight he accorded the various sources of evidence in the administrative record. In considering the medical evidence, ALJ Russak never mentions any of the factors set out in the regulations. For example, ALJ Russak cites Dr. Mahony's report throughout his step three and step four analyses but never evaluates the treatment relationship or considers how well-supported his opinions are. (R. at 78-81); cf. Anderson v. Astrue, No. 07 CV 4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (stating that consultative physician's opinion "should not be accorded the same weight as the opinion of plaintiff's treating psychotherapist" because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day" (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1992))). As for Mr. Chaperon and Dr. Akwuba, ALJ Russak's opinion never mentions either by name, nor does it explain the weight he accorded what little evidence the record contains from those sources. In fact, the only indication that ALJ Russak considered the issue of what weight to accord the evidence in the record is a boilerplate statement that he "considered opinion evidence in

accordance with the requirements" of the regulations and various Social Security Rulings.  (R. at 79).  Given ALJ Russak's complete failure to explain how he evaluated the medical evidence in the record, remand is appropriate.  See Canales v. Commissioner of Social Security, 698 F. Supp. 2d 335, 344-45 (E.D.N.Y. 2010) (remanding where ALJ disregarded social worker's opinion "simply because it was the opinion of a social worker, not on account of its content or whether it conformed with the other evidence in the record").

### 3.  Residual Functional Capacity Analysis

When a claimant suffers from a mental impairment, the regulations require the ALJ to employ a specialized assessment at each step of his sequential analysis.  Rosado v. Barnhart, 290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003).  At step four, the ALJ must assess the claimant's mental RFC by engaging in a detailed assessment of the claimant's ability to perform a variety of work-related functions.  Pabon v. Barnhart, 273 F. Supp. 2d 506, 515-16 (S.D.N.Y. 2003); see also SSR 96-8p, 1996 WL 374184, at *4, 6 (July 2, 1996).  Furthermore, the ALJ's RFC findings "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  SSR 96-8p, 1996 WL 374184, at *7; see also Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) ("Remand may be appropriate [] where . . . inadequacies in the ALJ's [RFC] analysis frustrate meaningful review."); Glessing v. Commissioner of Social Security, No. 13 CV 1254, 2014 WL 1599944, at *8-9 (E.D.N.Y. April

21, 2014) ("The problem . . . is that, although the ALJ certainly made <u>findings</u> as to the claimant's limitations, the ALJ provided no <u>analysis</u> explaining upon what evidence those findings were based."); <u>Jones v. Commissioner of Social Security</u>, No. 12 Civ. 4815, 2013 WL 3486994, at *12 (S.D.N.Y. July 11, 2013).

ALJ Russak described the plaintiff's mental RFC as follows:

> [T]he ability to perform only simple, routine tasks; the ability to perform only a low stress job, defined as having only occasional decision making and only occasional changes in the work setting; the need to be off task for 5% of the work day in addition to regularly scheduled breaks; the ability to perform tasks requiring only occasional judgment; and the ability to tolerate only occasional interaction with coworkers and the public.

(R. at 79). While ALJ Russak articulates the correct legal standard for assessing the plaintiff's mental RFC, determining whether substantial evidence supports his findings is a fool's errand; his opinion "simply lists [his] RFC findings, and then cites particular pieces of evidence in the record, without connecting the two in any way." <u>Glessing</u>, 2014 WL 1599944, at *9. Because the lack of a narrative discussion justifying the RFC determination frustrates meaningful review of ALJ Russak's decision, remand is appropriate so that the ALJ can explain his findings by citing medical and nonmedical evidence in the record and resolving any conflicting information.

    C.  <u>Substantial Evidence</u>

       1.  <u>The Off Task Limitation</u>

ALJ Russak's RFC findings indicate that the plaintiff's impairments require that she be "off task for 5% of the work day in

addition to regularly scheduled breaks." (R. at 79). As with the other RFC findings, the ALJ's opinion does not connect this limitation to any evidence, medical or otherwise. However, having reviewed the entire administrative record, I am confident that there is no "relevant evidence [that] a reasonable mind might accept as adequate to support" the ALJ's finding regarding off task time. Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). At no point does the medical evidence refer explicitly to the plaintiff's need for off task time, let alone a need for five percent as opposed to ten, twenty, or fifty. Indeed, it seems that the ALJ's determination regarding the need for off task time and the precise amount needed "was the result of [his] own surmise." Cosnyka v. Colvin, 576 F. App'x 43, 46 (2d Cir. 2014). To the extent that the record supports a finding on remand that Ms. Padgett requires off task time, the specific amount must be explicitly linked to evidence.

In sum, there is no substantial evidence that supports this aspect of the ALJ's RFC findings.

### 2. Availability of Jobs that Plaintiff Can Perform

During the vocational expert's testimony, after ALJ Russak posed his hypothetical he followed up by asking whether there would be any jobs available for a worker who required twenty percent of "off task" time, i.e., eight hours per workweek. (R. at 122). The vocational expert responded unequivocally: "No, there would not be." (R. at 122). ALJ Russak never asked the vocational expert about the availability of jobs for a worker who requires only five

percent of off task time.[21]  Nevertheless, ALJ Russak writes in his opinion that he asked the vocational expert "whether jobs exist in the national economy for an individual with the claimant's . . . residual functional capacity" and that the vocational expert testified that such an individual "would be able to perform the requirements" of several representative occupations.  (R. at 82). Because the ALJ never asked the vocational expert about the impact that a five percent "off task" limitation would have on the hypothetical individual's ability to perform jobs in the national economy, his conclusion that jobs exist which the plaintiff could perform is unsupported.[22]  Cf. Sanchez v. Colvin, No. 14 CV 1008, 2015 WL 4390246, at *15 (E.D.N.Y. July 14, 2015) ("[T]he ALJ's

_____

[21] "The Commissioner submits that the transcription 'Work that walks as a high percent of the day [phonetic]' should instead read 'would be off-task five percent of the day.'"  (Def. Memo. at 8 n.7).  The Commissioner's speculative submission does not make a meaningful difference in this case.  Remand is an appropriate remedy in cases where particularly relevant portions of hearing transcript are unintelligible, as the reviewing court cannot adequately assess the record.  See Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 2006) ("Faced with such an incomplete record of Pratt's hearing, we of course cannot say that ALJ's decision is supported by substantial evidence."); Bula v. Commissioner of Social Security, No. 6:06-CV-1325, 2009 WL 890665, at *11 (N.D.N.Y. March 30, 2009) ("While the ALJ may have heard plaintiff's testimony, the transcript of that testimony is insufficient and does not allow for an accurate review by this court.")

[22] The ALJ made another (though less significant) finding in his step five analysis that is not supported by substantial evidence.  He stated that the plaintiff "has at least a high school education."  (R. at 81).  In fact, the regulations define a high school education as "formal school at a 12th grade level or above." 20 C.F.R. § 416.964(b)(4).  While the plaintiff's testimony on this point is ambiguous due to the ALJ's poorly constructed question ("Now you graduated high school and you stopped in the 11th grade?" (R. at 110)), the record makes clear that the plaintiff's schooling ended before she reached the 12th grade.  (R. at 195, 227, 233, 463).

conclusion that jobs existed in significant numbers . . . must be based on some evidence beyond the ALJ's own intuition or speculation.").

Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding the case for a rehearing.  Remand is appropriate where "there are gaps in the administrative record or the ALJ has applied an improper legal standard."  Rosa, 168 F.3d at 82-83 (quoting Pratts, 94 F.3d at 39).  In this case, I am not in the position to determine whether Ms. Padgett is entitled to benefits or for what period.  Instead, the ALJ should make such a determination after further development of the record and a proper assessment of the evidence.

Conclusion

For the foregoing reasons, I recommend denying the Commissioner's motion for judgment on the pleadings (Docket no. 9), vacating the Commissioner's decision denying benefits, and remanding the case pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, Room 1310, and to the chambers of the

undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.

Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
      February 8, 2016

Copies transmitted this date:

Wendy Brill, Esq.
Wendy Brill Attorney at Law
9 Murray St., 4th Floor
New York, NY 10007

Tanya Padgett
620 E. 137th Street
Apt. 5H
Bronx, NY 10454

Robert R. Schriver, Esq.
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Rm. 3904
New York, NY 10278-0004